*981 McKEOWN, Circuit Judge,
dissenting:
I respectfully dissent. After extensive public comment, in 2001 the United States Department of Agriculture (“USDA”), acting through the United States Forest Service, adopted the Roadless Area Conservation Rule. Special Areas; Roadless Area Conservation (“Roadless Rule” or “Rule”), 66 Fed.Reg. 3244, 3253 (Jan. 12, 2001) (to be codified at 36 C.F.R. pt. 294). The Rule specifically applied to Alaska’s Ton-gass National Forest (the “Tongass”), which is by far the nation’s largest forest. The Ninth Circuit reversed a preliminary injunction enjoining the USDA from implementing the Roadless Rule nationally, and the Tenth Circuit upheld the Rule. Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1126 (9th Cir.2002), partially abrogated on other grounds by Wilderness Soc’y v. U.S. Forest Serv., 630 F.3d 1173 (9th Cir.2011); Wyoming v. USDA, 661 F.3d 1209, 1272 (10th Cir.2011).
In an about-face, the USDA decided in 2003 to temporarily exempt the Tongass from the Roadless Rule, pending the USDA’s adoption of a final, permanent rule, which the agency never actually promulgated. Special Areas; Roadless Area Conservation; Applicability to the Tongass National Forest, Alaska (“Tongass Exemption”), 68 Fed.Reg. 75,136 (Dec. 30, 2003) (to be codified at 36 C.F.R. pt. 294). That monumental decision deserves greater scrutiny than the majority gives it. Our precedent demands a “thorough, probing, in-depth review” of the USDA’s decision, not a cursory quick look. See Nat’l Ass’n of Home Builders v. Norton, 340 F.3d 835, 841 (9th Cir.2003). In an extensive, well-reasoned decision, the district court held that the Tongass Exemption is arbitrary and capricious. I agree. Tellingly, the USDA did not appeal this decision, leaving only the State of Alaska before us now.
The majority fails to adequately probe the record for a reasoned justification for the USDA discarding its previous position — adopted only two years earlier — to apply the Roadless Rule to the Tongass. Of course agencies may change their positions over time, and over administrations, but they cannot completely reverse course lightly. Rather, the USDA must have “good reasons” for the policy and it must “believe!] it to be better.” FCC v. Fox Television Stations, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009); see id. at 515-16, 129 S.Ct. 1800 (“[I]t is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.”). Contrary to the majority’s contention, Maj. Op. at 974-75, where, as here, a “new policy rests upon factual findings that contradict those which underlay its prior policy,” the agency must “provide a more detailed justification than what would suffice for a new policy created on a blank slate.” Fox Television, 556 U.S. at 515, 129 S.Ct. 1800. That justification is missing here.
In assessing the USDA’s proffered reasons, the majority entirely side-steps the main rationale that Alaska provides for the rule change: complying with the operative statutes, the Alaska National Interest Lands Conservation Act of 1980 (“ANIL-CA”), 16 U.S.C. § 3101 et seq., and the Tongass Timber Reform Act of 1990 (“TTRA”), 16 U.S.C. § 539d, which amended ANILCA. The reasons the majority does provide — legal uncertainty, timber demand, and socioeconomic hardships— are unsupported by the record and thus are insufficient to uphold the USDA’s decision.
I would affirm the district court’s decision because the administrative record *982 does not support the reasons for the rule change that the USDA gave in its Tongass Exemption Record of Decision (“ROD”). See Tongass Exemption, 68 Fed.Reg. 75136; see also Motor Vehicle Mfrs. Ass’n of U.S., Inc. v. State Farm, Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (“It is well-established that an agency’s action must be upheld, if at all, on the basis articulated by the agency itself.”).
I. The USDA Did Not Rest Its Rule Change on Compliance with ANILCA and TTRA
Alaska principally argues that, in viewing the ROD as a whole, the “USDA’s primary legal concern in pursuing this rulemaking was to comply” with ANILCA and TTRA. The majority’s analysis omits this issue entirely, stating without further discussion that applying the Roadless Rule to the Tongass “might violate ANILCA.” [1] Maj. Op. at 976.
The ROD provides no support for Alaska’s proposition or the majority’s conjecture. In initially adopting the Roadless Rule, the USDA took the position that such a rule would not violate ANILCA and TTRA. As Alaska acknowledges, in the ROD the “USDA did not explicitly reverse its legal conclusion about whether applying the Roadless Rule to the Tongass violates ANILCA or TTRA.”
In fact, the USDA neither explicitly nor implicitly changed its position on complying with these statutes. The ROD makes no reference to ANILCA and TTRA as a basis for the USDA’s decision. Rather, the ROD merely recounts the factual history of the USDA’s settlement in Alaska’s earlier legal dispute, stating: “The Alaska lawsuit alleged that USDA violated ANIL-CA by applying the requirements of the roadless rule to Alaska’s national forests. USDA settled the lawsuit by agreeing to publish a proposed rule which, if adopted, would temporarily exempt the Tongass from the application of the roadless rule.... ” Tongass Exemption, 68 Fed. Reg. at, 75,136 (emphasis added). Even the settlement agreement explicitly provided that it “shall not be evidence of any agreement by any party to any allegations raised by any other party in the case.... ”
In responding to public comments on the import of ANILCA, the ROD explained that the statute, as amended by TTRA, should allow for considerations other than timber demand. Tongass Exemption, 68 Fed.Reg. at 75,142. It directed the Secretary of Agriculture to seek to provide a supply of timber meeting market demand “consistent with providing for the multiple use and sustained yield of all renewable forest resources, and subject to appropriations, other applicable laws, and the requirements of the National Forest Management Act.” Id. The ROD stated that the USDA “considered carefully” the statutes and that the Exemption was “consistent” with ANILCA. Id. But significantly, the USDA did not state that the statute mandated an exemption. Id.
Alaska has no basis to bootstrap its allegations from a prior suit to impose a theory or obligation on the USDA that the agency did not adopt or articulate. Yet this unsupported statutory theory permeates Alaska’s entire argument on appeal. Consequently, the district court correctly determined that the ROD did not include compliance with ANILCA and *983 TTRA as an express rationale for the Ton-gass Exemption.
II. The USDA’s Justifications For the Rule Change Fall Short
Beyond statutory compliance, Alaska argues that the USDA provided four main reasons for the Tongass Exemption: (i) legal uncertainty, (ii) timber demand, (iii) socioeconomic costs, and (iv) roadless values.[2] To properly assess the ROD, we must ask whether — in light of all the proffered justifications — the record supports the USDA’s rationale for excluding the Tongass from the Roadless Rule’s reach.
According to the ROD, the USDA in part adopted the Tongass Exemption because it “best implemented] the letter and spirit of congressional direction along with public values, in light of the abundance of roadless values on the Tongass, the protection of roadless values already included in the Tongass Forest Plan, and the socioeconomic costs to local communities of applying the roadless rule’s prohibitions.” Ton-gass Exemption, 68 Fed.Reg. at 75,142. The record contradicts the USDA’s rationale for finding an exemption necessary or believing it to be the “best” option in light of legal uncertainty, timber demand, socioeconomic costs, and roadless values.
A. Legal Uncertainty
The ROD stated that the Tongass Exemption would reduce the “great uncertainty about the implementation of the roadless rule due to the various lawsuits.” Tongass Exemption, 68 Fed.Reg. at 75,-138. The USDA’s stated aim was not to “end[ ] the Alaska litigation,” as the majority asserts, see Maj. Op. at 975-76, but to mitigate legal uncertainty. The district court’s conclusion captures the disingenuity of the USDA’s explanation and the majority’s uncritical acceptance of its rationale: “In light of the fact that the Tongass Exemption was promulgated as a temporary exemption and the Forest Service agreed to engage in further rulemaking addressing the Tongass and Chugach in a ‘timely manner,’ the USDA’s rationale that adoption of the temporary Tongass exemption would provide legal certainty is implausible.”
Unsurprisingly, the temporary rule and the attempted repeal of the Roadless Rule generated more litigation and prolonged the legal uncertainty — a foreseeable consequence of promulgating a permanent rule, granting a temporary exemption, and then attempting to repeal the permanent rule. See Special Areas; State Petitions for Inventoried Roadless Management, 70 Fed. Reg. 25,654 (May 13, 2005) (to be codified at 36 C.F.R. pt. 294) (repealing the Road-less Rule nationwide in favor of a “State petitions” process); California ex rel. Lockyer v. USDA, 459 F.Supp.2d 874, 909, 912 (N.D.Cal.2006) (striking down the repeal for violating the National Environmental Policy Act and the Endangered Species Act). Critical here is not that additional litigation ultimately ensued, but that a temporary change was unlikely to address the legal uncertainty surrounding the Roadless Rule’s implementation when the USDA reversed course. That the rule change was “initiated pursuant to the settlement agreement with the State of Alaska,” as the majority emphasizes, does nothing to support a claim that the temporary change would reduce this uncertainty. *984 See Maj. Op. at 976. In the ROD, the USDA even acknowledged that the temporary rule would not “foreclose options regarding the future rulemaking” for the permanent statewide rule, Tongass Exemption, 68 Fed.Reg. at 75138, making clear that it viewed the temporary rule as just that.
Before changing its position, the USDA determined that maintaining the Roadless Rule in the Tongass would lower lawsuit-related costs. The USDA’s 2000 final environmental impact statement (“FEIS”) stated that the Roadless Rule was “needed” in part because of “[njational concern over roadless area management continuing] to generate controversy, including costly and time-consuming appeals and litigation” from proposals to develop the roadless areas. The FEIS concluded that the selected “Tongass Not Exempt” alternative would result in the “[greatest savings in appeals and litigation costs.” Similarly, in 2001 the USDA “decided that the best means to reduce this conflict [wa]s through a national level rule,” i.e. the Roadless Rule. Roadless Rule, 66 Fed.Reg. at 3,253.
The agency then completely reversed its position in 2003, stating without explanation that the Tongass Exemption would reduce legal uncertainty. The USDA did not address the predicted increase in litigation costs, nor did it acknowledge that carving out the Tongass from the Roadless Rule’s reach likely would set off another litigation firestorm. The USDA failed to provide a “more detailed justification” for this blatant internal inconsistency and reversal of position, and no rationale that the USDA articulated suggests that it had a basis to believe at the time that a temporary exemption would create greater legal certainty. See Fox Television, 556 U.S. at 515, 516, 129 S.Ct. 1800. After advocating for a national rule to bring uniform application, the USDA bowed to pressure to exempt the Tongass and upended uniformity. The district court rightly rejected the USDA’s legal uncertainty rationale as “implausible.” The majority erroneously contends that this determination constituted post hoc analysis, Maj. Op. at 976, despite the district court’s clear examination of whether the reasons the USDA provided when it implemented the rule change logically supported the position reversal at that time.
B. TimbeR Demand and TTRA
The second proffered rationale — that the USDA promulgated the Tongass Exemption to meet predicted future timber demand — also lacks support in the record. We have recognized that “TTRA was written to amend ANILCA by eliminating its timber supply mandate” and to make the goal of meeting timber demand contingent on other additional criteria. Alaska Wilderness Recreation & Tourism Ass’n v. Morrison, 67 F.3d 723, 730-31 (9th Cir. 1995); see also 16 U.S.C. § 539d(a) (subordinating the aim of meeting timber demand to “appropriations, other applicable law, and the requirements of the National Forest Management Act of 1976,” and “to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources”). Importantly, “TTRA envisions not an inflexible harvest level, but a balancing of the market, the law, and other uses, including preservation.” Alaska Wilderness Recreation, 67 F.3d at 731.
Without mentioning TTRA or acknowledging that Congress specifically crafted the statute to accommodate competing goals, the majority states that the Tongass Exemption “was being promulgated to increase timber production to meet predicted future demand.” Maj. Op. at 978. The ROD concluded that “the roadless rule *985 prohibitions operate as an unnecessary and complicating factor limiting where timber harvesting may occur,” Tongass Exemption, 68 Fed.Reg. at 75141, but it did not explain why its cited facts regarding the potential long-term variability of the timber market supported a temporary exemption. The ROD recognized that, according to FEIS projections, “50 million board feet [ (“MMBF”) of timber] could be harvested annually in the developed areas along the existing road system in the Tongass.” Id. at 75,140. The FEIS for the Roadless Rule estimated in 2000 that this harvest would not support all of the timber processing facilities in the region. Id. However, as the ROD pointed out, the FEIS based these projections on a long-term market demand estimate of 124 million board feet that had proven several times greater than the actual market demand of subsequent years: “[T]he low market scenario [of 124 MMBF] appears optimistic in light of the 48 MMBF of Tongass National Forest timber harvested in 2001, the 34 MMBF harvested in 2002, and the 51 MMBF harvested in 2008....” Id. at 75,-141.[3] In short, the facts in the administrative record unequivocally showed a depressed timber demand. The Roadless Rule decision concluded that the available timber under contract provided “enough timber volume to satisfy about 7 years of estimated market demand.” Roadless Rule, 66 Fed.Reg. at 3,255. Based on the record, the timber demand did not support the Tongass Exemption.
The agency failed to give adequate reasons for adopting the temporary exemption, particularly given the USDA’s acknowledgment that the intervening years had shown timber demand was even lower than had been expected. It simply stated that timber demand in recent years was below long-term historical averages and speculated that this level could have been due to a mere cyclical downturn. This rationale failed to take account of the FEIS’s explicit conclusion that available timber was sufficient to meet near-term demand.[4] Although the rationale that the majority proposes, that it would be reasonable for the agency to employ long-range data over short-term trends, may be plausible, see Maj. Op. at 978, the agency itself never proffered such a rationale or otherwise provided an explanation for its evasive treatment of the low timber demand. To reiterate, its use of timber demand data need not be proven prescient with the benefit of time. Where it fails is in providing logical support for the rule change when it was made. Thus, the USDA’s long-range speculation justifying a near-term solution is at odds with the facts in the record.
C. Socioeconomic Costs
The ROD’s discussion of the Exemption’s socioeconomic impact on local communities in the Tongass, particularly with respect to job losses and road and utility needs, is similarly flawed. The ROD relied on the FEIS, which “estimated that a total of approximately 900 jobs could be lost in the long run in Southeast Alaska due to the application of the roadless rule.” Tongass Exemption, 68 Fed.Reg. at 75137 *986 (emphasis added). The ROD’S use of this estimate was arbitrary and capricious for two reasons. First, the estimate applied to long-term job losses, and the ROD failed to relate it to the short-term duration of the explicitly temporary Tongass Exemption. Second, the ROD did not consider the dramatic post-2000 decline in timber demand. The USDA based its FEIS job loss estimate on the assumption that the Roadless Rule would cause a reduction of 77 MMBF per year in timber harvesting that no longer held true in 2003. Yet, as explained above, between 2000 and 2003 timber harvests dropped dramatically due only to market demand. The USDA failed to account for these factual omissions, which the majority may not backfill for the USDA now. See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (“The court is not empowered to substitute its judgment for that of the agency.” (internal quotation marks omitted)); see Maj. Op. at 979-81. While the majority emphasizes the socioeconomic costs imposed by the isolation of local communities in the Tongass, see Maj. Op. at 978-79, the USDA provides no explanation for how a temporary rule change would alter the economic outlook for these communities. Because the record does not support the job loss rationale provided in the ROD and because the USDA did not take into account reduced timber demand and the short-term nature of the rule change when it was adopted, the district court correctly found the socioeconomic cost justification arbitrary and capricious.
The record also belies the USDA’s position in the ROD that the Roadless Rule would have significant negative impacts on meeting road and utility needs in the Ton-gass. The Roadless Rule maintained the Secretary of Agriculture’s discretion to approve Federal Aid Highways, if the project was “in the public interest,” or if it maintained the purpose of the land and “no other reasonable and prudent alternative exist[ed].”[5] Roadless Rule, 66 Fed. Reg. at 3256. Regarding state roads, the FEIS concluded in 2000 that “in the reasonably foreseeable future, construction of State highways through inventoried road-less areas in Alaska may not be an issue,” because “none of the [proposed State] transportation corridors identified in [the Tongass Land and Resource Management Plan] have received serious local or State support, and none are on any approved project lists.” The ROD did not identify any new road proposals that suggested a need for the Exemption.[6] The USDA failed to explain why road considerations warranted a temporary exemption given the lack of any potential road construction on the horizon.
Nor did the ROD explain the basis for the USDA’s new position that the Road-less Rule would impact utility corridors in southeastern Alaska. The Roadless Rule specifically permits construction of utility lines, along with the necessary vehicles and heavy motorized equipment. See Roadless Rule, 66 Fed.Reg. at 3,258, 3,272. The FEIS concluded that the nationwide utility corridor impacts “would be minimal” and it did not identify any impacts in southeastern Alaska. The ROD’S reliance on utility needs is at odds with the evi *987 dence. Moreover, as with its conclusion regarding road construction, the USDA failed to explain in the ROD why a temporary exemption was necessary when the agency could not point to any utility projects that it might affect.
D. Roadless Values[7]
In the ROD, the USDA stated that it had “determined that, at least in the short term, the roadless values on the Tongass are sufficiently protected under the Ton-gass Forest Plan and that the additional restrictions associated with the roadless rule are not required.”[8] Tongass Exemption, 68 Fed.Reg. at 75,138. This posture, a reversal of the position the USDA adopted in the Roadless Rule,[9] also is the kind of policy judgment — on what is “enough” protection — that cannot be readily deemed right or wrong. The agency’s ultimate policy decision on whether sufficient roadless value protection existed is necessarily linked to its reasoning on timber demand, community impact, and other factors, which are unsupported by the record. At bottom, the USDA failed to provide a logical explanation for its complete position reversal.
III. The USDA’s Error Was Not Harmless
In the rulemaking context, an error is “harmless only where the agency’s mistake clearly had no bearing on the procedure used or the substance of decision reached.” Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1487 (9th Cir.1992). Several of the USDA’s key rationales underlying the ROD “run[] counter to the evidence before the agency, or ... [are] so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise.” Montana Wilderness Ass’n v. McAllister, 666 F.3d 549, 555 (9th Cir. 2011) (internal quotation marks omitted). The USDA failed to account for relevant facts in the FEIS and the SIR that plainly contradicted the substance of the ROD’s conclusions. Therefore, the ROD cannot overcome the harmless error hurdle.
I respectfully dissent.

. The majority dismisses the need to explore this argument further because it was presented by Alaska, not the agency that promulgated the decision on review. Maj. Op. at 975, n. 4. Yet the USDA is not before us now, and this is the key argument made on appeal by Alaska, which is defending the Tongass Exemption.

. Apart from the four main justifications listed in the ROD, Alaska offers a number of other reasons to justify the USDA's position reversal, including that the USDA never gave a full explanation for why it initially applied the Roadless Rule to Alaska. Alaska’s effort falls flat, however, because the USDA did not proffer these explanations and the record does not support them.

. Market forces, not the Roadless Rule, explain these levels, given that the Roadless Rule did not go into effect in the Tongass due to various injunctions, see California ex rel. Lockyer v. U.S. Dept. of Agriculture, 575 F.3d 999, 1006-07 (9th Cir.2009) (recounting history of legal challenges to the Roadless Rule), and due to the Tongass Exemption.

. During the 2003 rulemaking on the Tongass Exemption, the Forest Service found that no significant factual developments arose since the Roadless Rule that justified another EIS and accordingly relied on the FEIS prepared for the Roadless Rule. 68 Fed.Reg. at 75141.

. Even without the Roadless Rule, the Secretary’s decision to approve such highways is discretionary. See 23 U.S.C. § 317(b).

. The agency’s Supplemental Information Report (“SIR”) for the Tongass Exemption specifically stated that “no new information has come to light that would alter the expectations of major roads or transportation corridors or associated economic impacts estimate[d] in the Roadless [Rule] FEIS...."

. Roadless values include high quality or undisturbed soil, water, and air; sources of public drinking water; diversity of plant and animal communities; habitat for threatened, endangered, and sensitive species; varieties of dispersed recreation; reference landscapes; and traditional cultural properties and sacred sites. Roadless Rule, 66 Fed.Reg. at 3,245.

. The majority asserts that the USDA did not express roadless values as a reason for the rule change. Maj. Op. at 979, n. 12. However, as the quoted ROD text reveals, the USDA did expressly factor into its rationale its view that the roadless values were sufficiently protected. See also Tongass Exemption, 68 Fed. Reg. at 75,142.

.The USDA’s position also expressly contradicts Ninth Circuit precedent determining that "the Roadless Rule provide[s] greater substantive protections to roadless areas than the individual forest plans it superseded.” Lockyer, 575 F.3d at 1014 (citing Kootenai Tribe, 313 F.3d at 1110, 1124-25).